# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

| | | |
|---|---|---|
| **LORI PRUITT,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **CIVIL ACTION FILE NO.** |
| | ) | |
| **v.** | ) | **1:06-CV-1194-AJB** |
| | ) | |
| **MICHAEL J. ASTRUE,**[1] | ) | |
| ***Commissioner of Social*** | ) | |
| ***Security Administration,*** | ) | |
| | ) | |
| **Defendant.** | ) | |

## <u>ORDER AND OPINION</u>[2]

Plaintiff Lori Pruitt ("Plaintiff") brought this action pursuant to §§ 216(i), 223 and 1614(a)(3)(A) of the Social Security Act, 42 U.S.C. §§ 416(i), 423, and 1382c(a)(3)(A), to obtain judicial review of the final decision of the Commissioner of the Social Security Administration ("the Commissioner"), denying her application for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI")

---

[1]     On February 12, 2007, Michael J. Astrue was sworn in as Commissioner of Social Security.  Under the Federal Rules of Civil Procedure, Astrue "is automatically substituted as a party." FED. R. CIV. P. 25(d)(1).  The Clerk is **DIRECTED** to amend the docket to reflect this substitution.

[2]     The parties have consented to the exercise of jurisdiction by the undersigned pursuant to 28 U.S.C. § 636(c) and FED. R. CIV. P. 73. [Docs. 13, 14]. Therefore, this Order constitutes a final Order of the Court.

payments under the Social Security Act ("the Act").[3]  For the reasons stated below, the

undersigned **RECOMMENDS** that the Commissioner's decision be **REVERSED** and

the case be **REMANDED** for the ALJ to consider and evaluate properly Plaintiff's

credibility and her non-exertional impairments.

## I.   PROCEDURAL HISTORY

Plaintiff filed an application for DIB and SSI[4] on March 18, 2002, alleging

disability commencing on June 1, 2001.  [Record (hereinafter "R") 49-51].  Plaintiff's

application was denied initially and on reconsideration.  [R25-28, 30-33].  Plaintiff then

requested a hearing before an Administrative Law Judge ("ALJ"), [R36-37], which was

held on July 27, 2005.  [R13, 229-57].  The ALJ issued a decision on October 21, 2005,

---

[3]     Title II of the Social Security Act provides for federal disability insurance benefits.   42 U.S.C. § 401 *et seq*.   Title XVI of the Social Security Act, 42 U.S.C. § 1381, *et seq*., provides for supplemental security income benefits for the disabled.  The relevant law and regulations governing the determination of disability under a claim for DIB are nearly identical to those governing the determination under a claim for SSI.  *Davis v. Heckler*, 759 F.2d 432, 435 n.1 (5th Cir. 1985).   Although different statutes and regulations apply to each type of claim, in general, the legal standards to be applied are the same regardless of whether a claimant seeks DIB, to establish a "period of disability," or to recover SSI, which are not tied to the attainment of a particular period of insurance disability.   *Id.*; *Baxter v. Schweiker*, 538 F. Supp. 343, 350 (N.D. Ga. 1982).   Therefore, to the extent that the Court cites to SSI cases, statutes, or regulations, they are equally applicable to Plaintiff's DIB claims.

[4]     Plaintiff's application for SSI was not included in the record.  [*See* Doc. 7 at "Court Transcript Index"]

denying Plaintiff's claims on the grounds that she retained the residual functional capacity ("RFC") to perform her past relevant work or, alternatively, other sedentary jobs. [R13-22]. Plaintiff then sought review by the Appeals Council. [R7, 227]. On March 8, 2006, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner. [R4-7].

Plaintiff filed the instant action in this Court on May 9, 2006, seeking review of the Commissioner's decision. *Lori Pruitt v. JoAnne B. Barnhart,* Civil Action File No. 1:06-CV-1194. [Doc. 2]. The answer and transcript were filed on December 19, 2006. [Docs. 6-7]. The matter is now before the Court upon the administrative record, the parties' pleadings, briefs and oral argument, and is ripe for review pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3).

## II.     STATEMENT OF FACTS

### A.     *Factual Background*

Plaintiff was born on November 24, 1962, and was 42 years old at the time of the administrative evidentiary hearing. [R233]. She has a high school education and past relevant work was as a mail assembler, cashier/checker, warehouse broker (a type of order-filling position) and sales clerk. [R248]. Plaintiff alleges disability based on a herniated cervical disk, which causes neck, back and bilateral arm pain, [R57-66], as

3

well as knee pain and migraines. [R14]. Plaintiff also alleges additional impairments from inability to concentrate, side effects of prescription medications and depression. [Doc. 10, Plaintiff's Brief ("P") at 15, R240].

   B.    *Medical Records*

   The medical evidence is comprised of records from various treating physicians at St. Joseph's Hospital ("St. Joseph's"), Resurgens Surgical Center ("Resurgens"), Northside Hospital, and North Fulton Grady Clinic, as well as Dr. Ralph D'Auria at Rehab Orthopedic Medicine and Dr. Kaveh Khajavi at Georgia Spine & Neurosurgery Center.

   On March 8, 2001, Plaintiff was seen at St. Joseph's for reports of pain in her neck and left shoulder. Dr. Miller, the treating physician, found tenderness to palpitation of the left and right trapezius but no point tenderness over the cervical spine, and that her arms were neurovascularly intact and her reflexes were normal. He diagnosed torticollis[5] and prescribed Flexeril, Motrin and ten doses of Lortab. Plaintiff was advised to follow up with orthopedics if she did not experience relief within five days. [R113].

_____

   [5]    Torticollis is "a contracted state of the cervical muscles, producing twisting of the neck and an unnatural position of the head." DORLAND'S ILLUSTRATED MEDICAL DICTIONARY (28th ed.) at 1723.

4

On October 5, 2001, Plaintiff returned to St. Joseph's with complaints of left shoulder discomfort, which had been persistent for four to six weeks. [R112]. Dr. Alan Farabaugh noted that Plaintiff had been seen at Northside Hospital approximately two to three weeks prior and that x-rays taken at that time were negative. He observed that her left shoulder was tender and that while she "put the shoulder through a full range of motion . . . this was inhibited by pain." Dr. Farabaugh diagnosed acute left shoulder pain likely caused by muscular strain, and rotator cuff injury versus severe tendinitis or bursitis. He prescribed Lortab and Motrin as needed for pain, Skelaxin as needed for spasms and advised her to seek orthopedic treatment. [*Id.*].

Plaintiff was seen on November 5, 2001, at Resurgens by Dr. Eric Carson for complaints of left shoulder pain. [R125-26]. Dr. Carson observed that Plaintiff stated that she worked in a bridal shop and did a significant amount of heavy lifting but later noted that she was unemployed. Plaintiff claimed to be experiencing discomfort in her left shoulder and a significant amount of neck pain. Plaintiff reported that she could not sleep and had numbness, tingling and a burning sensation. Her past medical history was significant for migraine headaches and low back and neck pain. Plaintiff showed

5

positive Spurling's test[6] and decreased range of motion with flexion and extension. She had full range of motion of the shoulder and negative impingement, Hawkins[7] and Neer[8] testing. Her motor strength was 5/5 for all muscle groups. [*Id.*]. A radiograph of her cervical spine revealed small osteophytes at C5-C6 and C6-C7, but was normal for her shoulder. The impression was cervical spine pathology. Dr. Carson recommended conservative treatment, home physical therapy, and to return for an MRI if she did not see any improvement. [R126].

A physical therapy consultation performed at St. Joseph's Specialty Center for Wellness and Rehabilitation Care on November 13, 2001, indicated a diagnosis of cervical pain, [R105], and also cervical spine disease. [R105-08]. The report noted that

---

[6]    A "Spurling test" is an "evaluation for cervical nerve root impingement in which the patient extends the neck and rotates and laterally bends the head toward the symptomatic side; an axial compression force is then applied by the examiner through the top of the patient's head; the test is considered positive when the maneuver elicits the typical radicular arm pain." mediLexicon.com, Spurling test, http://www.medilexicon.com/medicaldictionary.php (last visited June 13, 2007).

[7]    "Hawkins impingement sign" is "pain produced by forced internal rotation of the humerus in 90° of abduction." mediLexicon.com, Hawkins impingement sign, http://www.medilexicon.com/medicaldictionary.php (last visited June 13, 2007).

[8]    "Neer impingement sign" is "pain produced by forceful maximum forward elevation of the upper extremity." mediLexicon.com, Neer impingement sign, http://www.medilexicon.com/medicaldictionary.php (last visited June 13, 2007).

AO 72A
(Rev.8/8
2)

Plaintiff had been to the emergency room twice over the past three months for neck pain extending to both shoulders and down her left upper extremity to her elbow, but that x-rays were negative. Plaintiff reported her current medications as Ibuprofen, Flexeril,[9] Tylenol and Hydrocodone.[10] [R105]. The therapist noted cervical spine flexion lacking 5 cm. of chin to chest, cervical spine extension 34 degrees, rotation right 58 degrees and rotation left 24 degrees, and side bending right 54 degrees and left 20 degrees. Plaintiff demonstrated 4/5 muscle strength in left upper extremity and 5/5 muscle strength in right upper extremity. Her left upper extremity strength was limited secondary to pain. [R105]. Plaintiff reported "very limited" ability to sleep and difficulty brushing her hair and teeth and blow-drying her hair because of pain in her neck. The assessment was "severe pain in [Plaintiff's] neck extending to the left upper extremity, left shoulder area." [R106]. The physical therapist recommended three

---

[9]     "Flexeril" is a brand name for cyclobenzaprine hydrochloride, a muscle relaxant. DORLAND'S\ILLUSTRATED MEDICAL DICTIONARY (28th ed.) at 414. Reported side effects include drowsiness, dry mouth and dizziness.

[10]    Hydrocodone is a "semisynthetic narcotic derivative of codeine having sedative and analgesic effects more powerful than those of codeine." DORLAND'S\ILLUSTRATED MEDICAL DICTIONARY (28th ed.) at 783. Most common side effects include lightheadedness, dizziness, sedation, nausea and vomiting. RxList.com, Hydrocodone Side Effects and Drug Interactions, http://www.rxlist.com/cgi/generic/hydrocodone_ad.htm., (last visited June 13, 2007).

AO 72A
(Rev.8/8
2)

visits a week for four weeks with a "rehab potential" of "good/minus."  [*Id.* at 106-07, 129-30].

On December 17, 2001, Plaintiff was seen by Dr. Carson for a follow up. [R124].  He noted that although her shoulder was much improved, "most  of the symptoms were related to her neck."  [*Id.*].  He further observed that Plaintiff underwent "aggressive physical therapy and [was] approximately 30-40% improved. Symptoms [were] still localized to the left shoulder, primarily radiculopathy."[11]  [*Id.*] Physical examination revealed deep tendon reflexes for biceps, triceps and brachioradialis were +1.  There was no evidence of any clonus.[12]  Her muscle strength was 5/5 for all muscle groups.  She had a positive Spurling's and her range of motion was full in her shoulder.  He diagnosed left shoulder impingement and cervical spine degenerative joint disease, and recommended that she return after receiving an MRI. [*Id.*].

On January 22, 2002,  on a referral from Dr. Carson, Plaintiff was seen at Resurgens Orthopedics by physician's assistant J. Michael Settle for complaints of

---

[11]     "Radiculopathy" is disease of the nerve roots.  DORLAND'S\ ILLUSTRATED MEDICAL DICTIONARY (28th ed.) at 1404.

[12]     "Clonus" is "alternate muscular contraction and relaxation in rapid succession.  DORLAND'S\ ILLUSTRATED MEDICAL DICTIONARY (28th ed.) at 342.

8

cervical discomfort.  [R122].  Plaintiff reported that the pain in her cervical spine had increased over the last five to six months with some numbness and tingling in her mesoscapular area, radiating bilaterally to her arms and hands.  The treatment notes reflect that Plaintiff had a "fairly good" range of motion of the cervical spine and no particular pain on flexion/extension.  [*Id*.].  No supraclavicular masses or tenderness and good strength of biceps, triceps and brachioradialis were observed.  The report noted that an MRI done on January 16, 2002, revealed a large posterior left-sided C5-6 disk extrusion resulting in spinal cord compression.  [R122, 127].  The diagnosis was cervical discomfort, herniated cervical disk and degenerative disk disease with recommendations fore cervical epidural steroid injections, along with continued physical therapy and medication.  [R122].  On February 13, 2002, March 7, 2002, and April 18, 2002, Plaintiff received cervical epidural steroid injections.  [R152, 150, 148].

Plaintiff concluded physical therapy on March 8, 2002.  [R131].  The record indicates that she received twenty-one treatments from November 13, 2001, until March 8, 2002, and had either no-showed or cancelled eight of the appointments.[13]

---

[13]    Plaintiff apparently missed one of these appointments because of snow, [*see* R138], and perhaps two additional appointments because of "transportation issues."  [R140].  Plaintiff attended her physical therapy appointments on 11/13/2001, 11/14/2001, 11/16/2001, 11/21/2001, 11/30/2001, 12/4/2001, 12/10/2001, 12/12/2001, 12/21/2001,  1/10/2002,  1/16/2002,  1/17/2002,  1/19/2002,  1/25/2002,  1/31/2002,

AO 72A
(Rev.8/8
2)

The therapist noted that she was "not confident" that Plaintiff was compliant with her home exercise program. [R144]. She also observed that "after 21 visits progress [was] minimal at best" and that Plaintiff "ha[d] made such minimal progress over the past 3 months that [she] did not feel like [physical therapy] had any more to offer her." [*Id*.].

Plaintiff was seen at Resurgens on April 24, 2002, for a follow-up. Settle reported that Plaintiff was still having pain in her neck after receiving the epidural steroid injections. She showed "fairly good" range of motion of the cervical spine and no pain on flexion/extension. The impression was a large posterior left-sided C5-6 disk extrusion resulting in spinal cord compression, with cervical discomfort, herniated cervical disk and degenerative disk disease. Settle recommended EMB/HNCV studies of the upper extremities and a referral back to physical therapy, prescribed Vicodin and told Plaintiff to return in one month. [R121].

On May 6, 2002, Plaintiff informed Resurgens that she had lost her Medicaid eligibility and would not be able to afford any tests until she was reinstated. Plaintiff also requested a refill of her pain medications. [R120].

---

2/4/2002, 2/6/2002, 2/8/2002, 2/11/2002, 2/12/2002, 2/18/2002, 2/22/2002. [R132-141].

On May 8, 2003, Plaintiff was seen at Northside Hospital Pain Treatment Center for re-evaluation of neck and bilateral arm pain.  [R198].  This treatment note entitled "Pain Treatment Physician's Report," reflects that Plaintiff had been seen on February 17, 2003, at which time the prescribed treatment plan was to continue medical management of her pain using Oramorph[14] and Neurontin.[15]  During the May 8 visit, she reported experiencing bilateral neck and arm pain.  Plaintiff described the quality of the pain as aching and burning and rated the severity of the pain from 3-10 out of 10.  She reported that she was 50% improved and that the Oramorph was helpful but requested the dosage be increased.  Plaintiff admitted that she did not take the Neurontin regularly as prescribed.  She denied "associated symptoms with the use of her current pain medication regimen."  [*Id*.].  The treating physician noted a decreased

---

[14]     "Oramorph" is the trademark name for "a preparation of morphine sulfate."  DORLAND'S\ ILLUSTRATED MEDICAL DICTIONARY (28th ed.) at 1187. Side effects include constipation, dizziness, drowsiness, headache, lightheadedness, nausea, restless mood and vomiting. Drugs.com, http://www.drugs.com/cdi/oramorph-sr-sustained-release-tablets.html, (last visited June 13, 2007).

[15]     "Neurontin" is "indicated for the management of posthepetic neuralgia in adults."  RxList.com, Neurontin Indications and Dosage, http://www.rxlist.com/cgi/generic/gabapent_ids.htm (last visited June 13, 2007). Neuralgia is "pain extending along the course of one or more nerves." DORLAND'S\ ILLUSTRATED MEDICAL DICTIONARY (28th ed.) at 1127.

11

range of motion in her cervical spine in all directions, and motor was 5/5 in bilateral upper extremities. There was tenderness to palpation in the bilateral trapezius and rhomboid regions and decreased sensation to light touch in the left fingers including the thumb. The impression was cervical radiculopathy and cervical herniated nucleus pulposus. Continued use of Oramorph, Neurontin and Flexeril was recommended, and Plaintiff was instructed to return for an office visit in two months. [*Id.*].

Plaintiff returned to Northside on October 2, 2003, for continued evaluation of neck, back and upper extremity pain. [R196]. She reported exacerbation in pain primarily in the upper extremities and took additional MS Contin[16] when the pain was severe. She reported taking Neurontin four times a day but that it "still" caused drowsiness. [*Id.*]. The treating physician noted no change from her previous physical exam and diagnosed cervical radiculopathy. He prescribed continued use of MS Contin and Flexeril three times a day and Neurontin four times a day. She was told to return in four months for a follow-up. [*Id.*].

Plaintiff returned to Northside's Pain Treatment Center on June 25, 2004, September 17, 2004, December 10, 2004, March 5, 2005, and April 1, 2005, for office

---

[16]    MS Contin is a trademark name for "a preparation of morphine sulfate." DORLAND'S\ ILLUSTRATED MEDICAL DICTIONARY (28th ed.) at 1061.

visits and refill of her prescriptions for Flexeril, MS Contin and Neurontin.  [R185-86].

On December 10, 2004, she reported a mild to moderate pain, a score of four on a scale

of ten.  She stated that she experienced pain 50-75% of the time.  [R193].[17]  On April

1, 2005, she reported moderate to severe pain - - indicating that the pain rated a seven

on a scale of ten.  She also claimed to have pain 50% of the day/night and that the pain

was worse at night and early morning when she walked, stood or sat for too long.

She also claimed to experience a headache all day and night.  [R184].[18]

On April 8, 2005, Plaintiff had a comprehensive examination by Dr. Ralph

D'Auria at Rehab Orthopedic Medicine.   [R212-214].  Plaintiff reported neck pain,

bilateral arm pain, low back pain, chest wall pain and right knee pain, attributed to a

motor vehicle accident that occurred on March 8, 2005.  She further reported that she

had been taken to North Fulton Hospital after the accident but that CT scans of the head

and neck were normal and X-rays of her chest and right knee were negative for

fractures.   She was given prescriptions for Lortab and Flexeril and was released.

---

[17]     This assessment does not reflect whether the ratings took into account the
effect of the pain medications.

[18]     The record also indicates that Plaintiff was seen at Grady Hospital from
November 4, 2004, until June 7, 2005, for complaints of abdominal pain which
appeared to be related to uterine fibroids.  [*See* R201-07].

13

[R212].  She stated that she returned to the emergency room on March 12, 2005, for a headache but that another CT scan was normal.  Plaintiff was subsequently seen by a chiropractor and started on physical therapy for her neck, low back, and right knee.

During the exam with Dr. D'Auria, Plaintiff complained of constant headaches in the frontal area and some associated dizziness and vomiting.  Plaintiff rated the headaches at eight on a scale of ten in severity.  She stated that the chest wall pain was constant as well and rated it a four out of ten.  She rated her constant neck pain as a seven on a scale of ten but stated that the pain was alleviated with the medications.  Plaintiff also rated her constant low back pain as a six out of ten which was worse at night or when standing from a seated position.  She rated her intermittent right knee pain as a six out of ten in severity.  [R212-13].

Upon examination, Dr. D'Auria found oblique compression on the right for left trapezius pain and on the left for right trapezius pain.  Shoulder depression on the right was positive for bilateral shoulder pain and on the left for shoulder blade pain.  He observed that cervical range of motion was limited to 50 degrees flexion with cervicothoracic pain and 50 degrees with left trapezius pain.  Right lateral flexion was limited to 35 degrees with left trapezius and arm pain.  Right rotation was limited to 30 degrees with right cervical pain and left rotation was limited to 50 degrees with left

14

cervical pain.  [R213].  He found that her thoracic range of motion on the right was limited to 25 degrees with lumbosacral pain and left rotation was limited to 25 degrees with midback pain.  He also found her lumbar range of motion limited to 30 degrees with lumbosacral pain.  [R214].

Dr. D'Auria noted that Plaintiff's "most prominent complaint" was headaches and found that her headaches were "partially post-concussion in origin, and partially cervicogenic."  [R214].  He also noted that while she was previously treated for a pre-existing cervical herniated disc, it had been under control until her car accident. He referred her to a neurologist to address the headaches and have an EMG and nerve conduction studies to evaluate if there was any new radiculopathy.  [*Id*.].  On April 13, 2005, Dr. D'Auria reported that the nerve conduction velocity studies of both upper extremities were normal.  [R211].

Plaintiff saw Dr. D'Auria again on April 20, 2005, for complaints of pain and weakness in her right knee.  He found that the right knee was tender on palpitation. Dr. D'Auria ordered a new MRI of Plaintiff's cervical spine in order to compare it to the one performed on September 8, 2004.  [R210].

On April 27, 2005, Plaintiff underwent an MRI of the cervical spine at Decatur Health Imaging. [R225].  The MRI indicated a large left-sided posterior osteophyte and

15

disc complex at the C5-6 level, effacing the anterior left CSF space and abutting the anterior left aspect of the cord.  The impression was degenerative disc disease at the C5-6 level.  [*Id*.].

On April 29, 2005, Dr. D'Auria reviewed Plaintiff's new MRI.  [R209]. He noted a "definite worsening in the recent MRI scan, compared with the previous one." [*Id.*].  He observed that the size of the disc was larger than previously and there was instability present.  Plaintiff reported that her neck pain was intermittent, rated at a 5/10 severity , with numbness and burning in both hands.  She claimed to have good and bad days.  She also complained of constant headaches that she rated at eight out of ten in severity and an intermittent sharp pain in her chest wall which she rated as six out of ten in severity.  The knee pain was intermittent and a six out of ten in severity. Dr. D'Auria advised Plaintiff that her neck condition was surgical and prescribed a cervical collar to wear at all times when she was up and active and a knee brace. She was advised to return as needed.  [*Id*.].

On June 9, 2005, Plaintiff was seen at the Georgia Spine and Neurosurgery Center by Dr. Kaveh Khajavi, at the request of her attorney, for symptoms of neck and bilateral arm pain which had worsened after her car accident on March 8, 2005. [R218].  She told Dr. Khajavi that an orthopedic surgeon had recommended surgery and

16

that a neurosurgeon had contradicted that recommendation, but did not state when these recommendations were made.  She further stated that prior to the car accident, "everything was getting better" and that she had stopped taking the Neurontin because her arm symptoms had improved.  [*Id.*].  Dr. Khajavi noted that she experienced depression.  [*Id.*].

Dr. Khajavi reviewed the MRI from April 2005 and noted significant disk degeneration at C5-6 and that degenerative changes at this level appeared long-standing.  Disc herniation appeared to be the same.  [R219].  On the new patient questionnaire, Plaintiff rated her neck, shoulder, arm and hand pain as a five on a scale of ten most of the time and her headache as an eight and one-half.  [R222].  Dr. Khajavi diagnosed degeneration of the cervical intervertebral  disc and explained that surgery might relieve some of her arm symptoms but probably would not affect her other symptoms.  [R219].

Plaintiff returned to Dr. Khajavi on June 23, 2005, for continued  bilateral arm and pain and burning and also neck pain.  [R216].   Dr. Khajavi  stated he intended to schedule Plaintiff for surgery.  [*Id.*].

17

C.      *Residual Physical Capacities Evaluations*

On May 28, 2002, Dr. Arthur Schiff completed a consultative residual functional capacity assessment.  [R159-66].  Dr. Schiff found that Plaintiff could occasionally lift 20 pounds and frequently lift 10 pounds.  He found that she could stand, walk and sit for about six hours in an eight hour workday.  He found she was unlimited in her ability to push and/or pull.  He found no postural limitations other than that she could only occasionally  climb and crawl.  She was limited in reaching in all directions, including overhead.  He found her symptoms to be "fully credible."  [R164].

On October 21, 2002, Dr. Ronald Lehman completed a second consultative residual functional capacity assessment.  [R167-73].  Dr. Lehman opined that Plaintiff could lift 50 pounds occasionally and 25 pounds frequently.  She could stand, walk and sit for about six hours in an eight hour workday.  She was unlimited in her ability to push and/or pull,  and had no postural limitations except that she could never climb ladders, ropes and scaffolds and could only occasionally crawl.   She had no manipulative limitations.  He noted that "[t]he severity of her symptoms and its alleged effect on function [was] consistent . . . with the total medical and nonmedical evidence, including statements by the claimant and others, observations regarding activities of daily living, and alterations of usual behavior or habits."  [R172].  Dr. Lehman noted

18

that she could not stand or sit for too long and that her complaints were partially credible.  [*Id.*].

Dr. Jan Douglas from Grady Memorial Hospital, one of Plaintiff's treating physicians, also completed a physical capabilities evaluation on June 28, 2005. [R176]. Dr. Douglas, who had treated Plaintiff for six months after her previous doctor went to another clinic, diagnosed cervical disc herniation and radiculopathy.  [R178-79]. Dr. Douglas indicated that Plaintiff could sit uninterrupted for one hour during an eight-hour work day and only two hours total during an eight hour day.  She could only stand for one hour during an eight hour workday.  Dr. Douglas opined that Plaintiff required "the freedom to rest, recline, or lie down at [her] own discretion throughout the normal workday."   Dr. Douglas indicated that Plaintiff could lift or carry five pounds occasionally and no pounds frequently and could not use either hand for simple grasping or fine manipulation due to "weakness in hands."  [R177].  She could not bend, squat, climb, crawl or reach.  Dr. Douglas found that Plaintiff's medications, MS Contin and Flexeril, caused drowsiness and sedation.  [*Id.*].

### D.    *Evidentiary Hearing Before the Social Security ALJ*

Plaintiff was 42 years old at the time of the hearing.  She testified that she was single with a fifteen year old son.  [R234, 246].  She testified that she was receiving

AO 72A
(Rev.8/8
2)

monetary assistance from Temporary Assistance for Needy Families ("TANF") but did not specify for how long. [R234]. Plaintiff completed high school. Her last job was as a sales clerk at a formal wear store, and that she stopped working in June of 2001 because she was laid off, for which she had received unemployment benefits. [R234].

Plaintiff testified that she experienced pain in her arms whenever she engaged in any activity that required lifting her arms over head. She also testified that walking also caused pain in her arms. [R237-38]. Plaintiff claimed that the epidural injections did not relieve her pain or improve her range of motion. [R238]. She also stated that the physical therapy she underwent consisted mainly of neck traction, heat and light massage and exercise. She explained that while she felt relief when heat was applied during physical therapy, "as soon as [she] got home the pain came back." [R239].

Plaintiff testified that at she experienced migraines and pain in her neck down to the center of her back, her shoulder blades, and arms and fingers. She claimed to have the "migraines" every day. [R244]. Plaintiff also claimed to have a burning sensation in her fingers, arms and shoulder blades as well as in her thighs. [R240]. She testified that she suffered from bilateral weakness in her arms and fingers and that she had difficulty writing and could not lift a cereal bowl. [R241]. She also testified that she experienced knee pain. [R240].

Plaintiff testified that she took MS Contin, oral morphine, for the pain and that this medication provided two to three hours of pain relief, after which the pain returned. [R240-41]. She stated that the MS Contin caused extreme sleepiness and "pretty much knock[ed] [her] out." [R242]. She further testified that, in addition to the MS Contin, she took extra strength Tylenol to help with the headaches. She rated her overall pain from both the headaches and neck, shoulders and back as a ten on a scale of one to ten without medication and a six with pain medication. [R244-46]. Plaintiff claimed that without the pain medication for her headaches, "the only thing [she] can do is lay, lay there. No light, no noise." [R245]. Plaintiff claimed to have experienced pain since 2001. [R246].

Plaintiff testified that she was in the process of scheduling surgery with Dr. Khajavi[19] at the Georgia Spine and Neurosurgery Center. She stated that Dr. Khajavi informed her that her condition was "really bad" and that she may have permanent damage and that he intends to try to relieve pressure from the disc pressing on Plaintiff's spinal cord. Plaintiff testified that there was a chance that the surgery would not work. [R244].

_____

[19]     Dr. Khajavi's name was incorrectly spelled as "Pajavi" in the hearing transcript. [*See* R242-43].

21

Upon questioning by the ALJ, Plaintiff testified that she spends most of the day lying on the sofa while her son was at school.  [R246].  She testified that she did very little house work and performed "one thing a day."  [*Id.*].  Plaintiff stated that she might vacuum the living room one day and the bedrooms the next day.  [*Id.*].

The Vocational Expert ("VE") testified that Plaintiff's past relevant work as a mailer assembler with an insurance company and as a cashier/checker in a drug store and grocery store was considered light, semi-skilled work.  Plaintiff's work as a warehouse broker, which the VE stated was an order/filler type of job, was rated as medium exertional level and unskilled.  Plaintiff's work in a grocery store meat department as a storage laborer and meat wrapper were unskilled, medium exertional positions.  The VE also found Plaintiff's job as a sales clerk as semi-skilled and light, although some of the duties associated with that position, such as using a clothes steamer, would be rated as medium, unskilled.  [R248-49].

The ALJ posed several  hypotheticals to the VE.  [R249-253].  For the first hypothetical, the ALJ asked:

> [i]f we have a hypothetical individual who was capable of lifting and carrying at least 20 pounds occasionally, lesser amounts frequently and would be able to stand and/or walk at lease six out of eight hours, given those particular conditions and limitations, would such a person be capable of performing any of the claimant's past relevant work?

The VE responded that this hypothetical individual would be able to perform the jobs of mailer assembler, cashier/checker and sales clerk. [R249]. Upon further questioning by the ALJ, the VE testified that only the sales clerk position would require reaching overhead frequently. [R249-50].

The ALJ next inquired:

if "we had a hypothetical individual who was capable of lifting and carrying at least ten pounds occasionally, would be able to stand and/or walk at least two hours in an eight hour period. Given those conditions and limitations, would that be consistent with someone performing sedentary work. . .?

The VE responded in the affirmative. [R250]. The ALJ then asked whether there were sedentary jobs that did not require frequent lifting above the shoulder level. The VE responded that virtually none of the unskilled, sedentary jobs would require reaching above shoulder level and that most were performed at a level between shoulder level and the waist level. The VE testified that 137 unskilled, sedentary jobs met this description. [R251].

The ALJ next inquired whether a hypothetical person who experienced migraines daily at a pain level of six who could not concentrate be able to perform any kind of unskilled job at any level. The VE testified that headaches at that frequency and severity would preclude all work. [R251]. He also stated that if the individual had to

23

lie down for "unpredictable and indeterminate amounts of time," he or she could not maintain employment in any competitive job.  [*Id.*].  The VE also concluded that one who experienced sleepiness that prevented sufficient concentration or being able to perform single, repetitive tasks precluded performance of any kind of competitive work.  [*Id.*].

Finally, the ALJ asked whether it was essential that an individual be capable of handling or manipulating in a sedentary or light unskilled position.  The VE responded that "good bilateral use of both upper extremities and hands, particularly with fingering and handling, is a significant requirement in all unskilled, sedentary work."  [R252].

Upon questioning by the Plaintiff's attorney, the VE concluded that a hypothetical person could not perform Plaintiff's past relevant work or any job in the national economy if the person was of Plaintiff's age, education and work experience, and could not lift more than five pounds occasionally, needed to alternate between sitting and standing and could not stand for more than one hour per day, experienced drowsiness three hours per day which limited the ability to concentrate, could not perform fine manipulation or simple grasping up to one third of the work day, and required the ability to lie down and rest during the day.  [R253-54].

24

At the close of the hearing, Plaintiff testified that the car accident that occurred in March 2005 aggravated her herniated disc and that she has to wear a cervical collar and knee brace every day until she went to bed. [R254-55]. Plaintiff testified that she took Zoloft for depression but that she was not seeing any kind of mental health provider at the time. [R255].

## III.   ALJ'S FINDINGS OF FACT

The ALJ made the following findings of fact:

1. The claimant meets the non-disability requirements for a period of disability and Disability Insurance Benefits set forth in Section 216(i) of the Social Security Act and is insured for benefits through the date of this decision.

2. The claimant's herniated nucleus pulposus with associated pain to include cervical radiculopathy is "severe" but the severity does not meet or medically equal the criteria of any impairments listed in Appendix 1, Subpart P, Regulation No. 4.

3. The undersigned finds the claimant's allegations regarding her limitations are not credible for the reasons set forth in the body of this decision.

4. The claimant has the residual functional capacity to perform light exertional work. She can lift and carry 10 pounds frequently, 20 pounds occasionally and walk and/or stand for 6 out of 8 hours.

5. The claimant's past relevant work as mail assembler, cashier/checker and as a grocery checker/cashier did not require the

25

AO 72A
(Rev.8/8
2)

performance of work-related activities precluded by her residual functional capacity (20 CFR §§ 404.1545 and 416.965).

6.    The claimant's medically determinable cervical radiculopathy and a herniated nucleus pulposus with associated pain do not prevent her from performing her past relevant work, or in the alternative, other sedentary jobs.

7.    Given her age, education, past relevant work and particular residual functional capacity, the claimant is capable of performing other work that exists in significant numbers in the economy.

8.    The claimant was not under a "disability" as defined in the Social Security Act, at any time through the date of the decision. (20 C.F.R. §§ 404-1520(f) and 416.920(f).

[R20-21].

After reviewing Plaintiff's medical history, the ALJ stated that the record did not reflect that Plaintiff had been diagnosed with depression "by acceptable medical protocol nor received any medical treatment" and for these reasons her alleged depression was "found not to be medically determined."  [R18].

The ALJ found that Plaintiff had a "medically determinable impairment or combination of impairments that reasonably could be expected to produce Plaintiff's pain. [R18].   The ALJ also stated that considered claimant's allegations of disabling symptoms according to the Eleventh Circuit three-part "pain standard" set forth in *Holt v. Sullivan*, 921 F.2d 1221 (11th Cir. 1991), but found that "the evidence fails to satisfy

26

both the second and third tier of the above-cited standard." [R19].  He found that while

Plaintiff underwent steroid injections "as an attempt at physical therapy," she "only

received inconsistent treatment since her alleged onset date."  [*Id*.].  He also observed

that she missed 25% of her physical therapy sessions and that the "physical therapist

advised that she was going to be discharged from the program due to problems with

compliance hurting the effort to resolve her medical issues."  He then noted that "the

treatment notes stop for many months and start back again in 2004" and that she had

improved before her accident.  [*Id.*].  The ALJ observed that surgery might only relieve

her arm symptoms but not the pain in her neck and back.  [*Id.*].  He concluded that

Plaintiff only had "infrequent treatment," [R20], and stated that he found Plaintiff's

allegations of disabling pain "to be less than fully credible."  [R18].

Additionally, the ALJ found that "[t]he evidence fails to substantiate the

claimant's allegations pertaining to the severity of the side effects of her medication."

[R19].

In regard to Dr. Douglas's RFC assessment, the ALJ stated:

Treatment records from the Grady Clinic date back only to November
2004 and fail to confirm that the frequency and duration of the reported
limitations is consistent with the medical findings.  From the available
notes, it appears that the claimant was being seen primarily for female
problems.

27

[R17].

## IV.   STANDARD FOR DETERMINING DISABILITY

An individual is considered disabled for purposes of disability benefits if she is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The impairment or impairments must result from anatomical, psychological, or physiological abnormalities which are demonstrable by medically accepted clinical or laboratory diagnostic techniques and must be of such severity that the claimant is not only unable to do previous work but cannot, considering age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy. 42 U.S.C. §§ 423(d)(2)-(3).

The burden of proof in a Social Security disability case is divided between the claimant and the Commissioner. The claimant bears the primary burden of establishing the existence of a "disability" and therefore entitlement to disability benefits. *See* 20 C.F.R. § 404.1512(a). The Commissioner uses a five-step sequential process to determine whether the claimant has met the burden of proving disability.

28

*See* 20 C.F.R. § 404.1520(a); *Doughty v. Apfel*, 245 F.3d 1274, 1278 (11th Cir. 2001); *Jones v. Apfel*, 190 F.3d 1224, 1228 (11th Cir. 1999). The claimant must prove at step one that she is not undertaking substantial gainful activity. *See* 20 C.F.R. § 404.1520(b). At step two, the claimant must prove that she is suffering from a severe impairment or combination of impairments which significantly limits her ability to perform basic work-related activities. *See* 20 C.F.R. § 404.1520(c). At step three, if the impairment meets one of the listed impairments in Appendix 1 to Subpart P of Part 404 (Listing of Impairments), the claimant will be considered disabled without consideration of age, education and work experience. *See* 20 C.F.R. § 404.1520(d). At step four, if the claimant is unable to prove the existence of a listed impairment, she must prove that the impairment prevents performance of past relevant work. *See* 20 C.F.R. § 404.1520(e). At step five, the regulations direct the Commissioner to consider the claimant's residual functional capacity, age, education and past work experience to determine whether the claimant can perform other work besides past relevant work. *See* 20 C.F.R. § 404.1520(f). The Commissioner must produce evidence that there is other work available in the national economy that the claimant has the capacity to perform. In order to be considered disabled, the claimant must

29

prove an inability to perform the jobs that the Commissioner lists.  *Doughty*, 245 F.3d at 1278 n.2.

If at any step in the sequence a claimant can be found disabled or not disabled, the sequential evaluation ceases and further inquiry ends.  *See* 20 C.F.R. §§ 404.1520(a) and 416.920(a).   Despite the shifting of burdens at step five, the overall burden rests upon the claimant to prove that she is unable to engage in any substantial gainful activity that exists in the national economy.  *Boyd v. Heckler*, 704 F.2d 1207, 1209 (11th Cir. 1983).

## V.      SCOPE OF JUDICIAL REVIEW

The scope of judicial review of a denial of Social Security benefits by the Commissioner is limited.  Judicial review of the administrative decision addresses three questions:  (1) whether the proper legal standards were applied; (2) whether there was substantial evidence to support the findings of fact; and (3) whether the findings of fact resolved the crucial issues.  *Fields v. Harris*, 498 F. Supp. 478, 488 (N.D. Ga. 1980).  This Court may not decide the facts anew, reweigh the evidence, or substitute its judgment for that of the Commissioner.   If supported by substantial evidence and proper legal standards were applied, the findings of the Commissioner are conclusive. *Lewis v. Callahan*, 125 F.3d 1436, 1439-40 (11th Cir. 1997); *Barnes v. Sullivan*,

AO 72A
(Rev.8/8
2)

932 F.2d 1356, 1358 (11th Cir. 1991); *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990); *Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir. 1987); *Hillsman v. Bowen*, 804 F.2d 1179, 1180 (11th Cir. 1986); *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983).  "Substantial evidence" means more than a scintilla, but less than a preponderance.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion and it must be enough to justify a refusal to direct a verdict were the case before a jury.  *Richardson v. Perales*, 402 U.S. 389 (1971); *Hillsman*, 804 F.2d at 1180; *Bloodsworth*, 703 F.2d at 1239.  "In determining whether substantial evidence exists, [the Court] must view the record as a whole, taking into account evidence favorable as well as unfavorable to the [Commissioner's] decision."  *Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986).  In contrast, review of the ALJ's application of legal principles is plenary.  *Foote v. Chater*, 67 F.3d 1553, 1558 (11th Cir. 1995); *Walker*, 826 F.2d at 999.

## VI.   CLAIMS OF ERROR

Although Plaintiff organizes her argument under two headings, she actually contends that the ALJ's decision was erroneous in four ways: (1) by failing to properly apply the pain standard when he found that Plaintiff's pain was not disabling; (2) by failing to properly evaluate Plaintiff's credibility; (3) by not giving proper weight to the

31

AO 72A
(Rev.8/8
2)

RFC by Dr. Douglas, one of Plaintiff's treating physicians; and (4) by failing to consider Plaintiff's non-exertional impairments of depression, inability to concentrate and side effects of her medication when formulating her RFC. The Court addresses each contention in turn.

## VII.   DISCUSSION

### A.   Evaluation of Plaintiff's Allegations of Pain.

Plaintiff first contends that the ALJ's incorrectly applied the Eleventh Circuit pain standard when he found that the objective medical evidence did not confirm the severity of Plaintiff's alleged pain. Plaintiff argues that the ALJ's analysis of factors related to Plaintiff's credibility do not directly address this medical evidence and, therefore, he does not adequately explain why the cervical nerve root impingement, shown in both MRIs and for which she received epidural shots, would not be reasonably expected to produce the level of pain claimed by Plaintiff. [Doc. 10 (Pl. Br.) at 8-10]. The Commissioner responds that the ALJ's rejection of Plaintiff's subjective complaints is supported by substantial evidence. [Doc. 11 (Def. Br.) at 11].

In evaluating a claimant's testimony regarding her pain or other subjective symptoms, the Eleventh Circuit's pain standard requires: "'(1) evidence of an underlying medical condition and either (2) objective medical evidence that confirms

the severity of the alleged pain arising from that condition or (3) that the objectively determined medical condition is of such a severity that it can be reasonably expected to give rise to the alleged pain.'" *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005) (quoting *Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991)).

The pain standard "is designed to be a threshold determination made prior to considering the plaintiff's credibility." *Reliford v. Barnhart*, 444 F. Supp. 2d 1182, 1189 n.1 (N.D. Ala. 2006). Thus, "[i]f the pain standard is satisfied, the ALJ must consider the plaintiff's subjective complaints." *James v. Barnhart*, 261 F. Supp. 2d 1368, 1372 (S.D. Ala. 2003). When a claimant's subjective testimony is supported by medical evidence that satisfies the pain standard, she may be found disabled. *Holt*, 921 F.2d at 1223. If the ALJ determines, however, that claimant's testimony is not credible, "the ALJ must show that the claimant's complaints are inconsistent with his testimony and the medical record." *Rease v. Barnhart*, 422 F. Supp. 2d 1334, 1368 (N.D. Ga. 2006).

Initially, the Court notes that the Commissioner's argument regarding the ALJ's credibility determination does not meet Plaintiff's argument regarding the ALJ's application of the pain standard head on. "No credibility determination is required if

33

a claimant does not meet the pain standard." *Reliford*, 444 F. Supp. 2d at 1189 n.1 (N.D. Ala. 2006).

Although Plaintiff is correct that the ALJ never directly addresses Plaintiff's two MRIs, a review of the ALJ's decision reflects that the ALJ actually reached contradictory conclusions as to whether or not Plaintiff satisfied the pain standard. The Eleventh Circuit's pain standard is based on 20 C.F.R. § 404.1529. *See Wilson v. Barnhart*, 284 F.3d 1219, 1226 (11th Cir. 2002) ("[T]he ALJ cites to 20 C.F.R. § 404.1529, which contains the same language regarding the subjective pain testimony that this Court interpreted when initially establishing its three-part pain standard.") (citing *Elam v. Railroad Retirement Bd.,* 921 F.2d 1210, 1214-15 (11th Cir. 1991)). Citing to 20 C.F.R. § 1529, the ALJ states that he followed a two-step analysis to evaluate Plaintiff's allegations of pain:

> Step one requires a determination of whether there is a medically determinable impairment or combination of medically determinable impairments that reasonably could be expected to produce the individual's pain or other symptoms.  Only if such an impairment or combination of impairments exists will the adjudicator proceed to step two of the evaluation process for evaluation of pain and/or other symptoms.

After this discussion, the ALJ concluded that:

> In the claimant's case, inasmuch as the record documents that she has a 'severe' medically determinable impairment as previously described

34

herein, the undersigned finds that evidence satisfies step one of the previously cited standard for assessing symptoms.

[R18].

The ALJ then found, however, that "the evidence fails to satisfy both the second and third tier" of the pain standard - i.e., that the objective medical evidence did not confirm the severity of the alleged pain or other symptoms or that the objectively determined medical condition is of such severity that it reasonably can be expected to give rise to the pain or other symptoms. [*See* R19]. Thus, the ALJ concluded both that medical record shows a medical impairment that could reasonably be expected to cause pain but that the record does not show an impairment that would be expected to cause pain.

Inasmuch as the ALJ went on to make a credibility determination, however, and, therefore, proceeded past the "threshold determination" represented by the pain standard, the inconsistent finding regarding whether or not there was objective evidence to support Plaintiff's allegations of pain are irrelevant to his conclusion that Plaintiff was not disabled. The evaluation of Plaintiff's credibility concerning her pain implicitly suggests that the ALJ: (1) found Plaintiff to have a medically determinable impairment of such severity that the impairment could have reasonably given rise to the

35

alleged pain; but (2) had questions as to whether Plaintiff's subjective complaints were supported by the medical evidence.  *See Dyer*, 395 F.3d at 1210; 20 C.F.R. § 404.1529(c); SSR 96-7p; *see also Bennett v. Barnhart*, 288 F. Supp. 2d 1246, 1250 (N.D. Ala. 2003) ("[T]he ALJ actually made a credibility determination, which would not have been necessary had he found these conditions did not satisfy the Eleventh Circuit's pain standard.").

Because the evidence implicitly shows that the ALJ considered Plaintiff to have satisfied the pain standard by making a credibility determination,[20] the Court turns to whether the ALJ's credibility determination was legally sufficient and if so, whether it was supported by substantial evidence.  *See James*, 261 F. Supp. 2d at 1372 (requiring ALJ to consider claimant's subjective complaints if the pain standard is met).

**B.      *ALJ's Evaluation of Plaintiff's Credibility***

"[C]redibility determinations are the province of the ALJ." *Moore v. Barnhart*, 405 F.3d 1208, 1212 (11th Cir. 2005).  The assessment of a claimant's credibility about her pain and other symptoms and their effect on her ability to function must be based on a consideration of all of the evidence in the case record.  20 C.F.R. §§ 404.1529(c),

---

[20]      The Court will not address Plaintiff's arguments that she established the pain standard because the ALJ implicitly determined that Plaintiff met this standard.

36

AO 72A
(Rev.8/8
2)

416.929(c); SSR 96-7p.  If the ALJ decides to discredit a claimant's subjective

testimony, the ALJ must articulate specific and adequate reasons for doing so, or the

record must be obvious as to the credibility finding.  *Foote*, 67 F.3d at 1561-62 (citing

*Cannon v. Bowen*, 858 F.2d 1541, 1545 (11th Cir. 1988)); *see also* 20 C.F.R. § 416.929;

SSR 96-7p; *Kieser v. Barnhart*, 222 F. Supp. 2d 1298, 1310 (M.D. Fla. 2002).  A broad

statement rejecting a claimant's credibility is insufficient.  *See Dyer*, 395 F.3d at1210.

A reviewing court will not disturb a clearly articulated credibility finding if there is

substantial supporting evidence in the record.  *Kieser*, 222 F. Supp. 2d. at 1310.

However, "[i]f the ALJ does not articulate a reason for rejecting credibility, the Court

cannot ascertain whether his finding is supported by substantial evidence." *Lorenzo v.

Heckler*, 603 F. Supp. 189, 192 (S.D. Fla. 1985).  Also, when an ALJ fails to state a

reasonable basis for rejecting the subjective testimony, the Eleventh Circuit requires

that the testimony be accepted as true.  *See Foote*, 67 F.3d at 1562.

Plaintiff contends that the ALJ's credibility finding is conclusory.  Plaintiff

claims that the ALJ "lists a litany of factors supposedly considered but does not connect

these factors to the facts of the record." (Pl. Br. at 9).  The Commissioner responds that

the ALJ's credibility determination is supported by substantial evidence because:

(1) the ALJ reviewed the objective medical findings; (2) the ALJ found that Plaintiff

had inconsistent medical treatment since her alleged onset date; (3) Plaintiff had not

undergone surgery; and (4) Plaintiff stopped working because she was laid off.

The Court concludes that the ALJ's credibility determination is not supported by

substantial evidence. *Martin*, 894 F.2d at 1529-30 (ALJ's credibility finding concerns

a finding of fact, which is reviewed to determine if it is supported by substantial

evidence).  The Commissioner is correct that the ALJ articulated several reasons for

finding Plaintiff's subjective complaints not credible, including the fact she did not

have surgery, missed a quarter of her physical therapy appointments and did not

perform her home exercises, and had "inconsistent" or "infrequent treatment." [R19,

20].  He also appears to rely on Plaintiff's statement that "everything was getting

better" prior to her automobile accident in March 2005, Dr. Khajavi's prognosis that

surgery might relieve her arm pain but not the neck and back symptoms, and the

suggestion in one of her medical records that Plaintiff was employed in November of

2001, as additional reasons for rejecting her complaints of disabling pain.  [*See* R19].

Although this Court is not empowered to re-weigh the evidence before the ALJ, the

Court finds that the ALJ's articulated findings, individually and in combination, do not

constitute evidence that "a reasonable person would accept as adequate to support a

38

conclusion." *Crawford v. Comm'r of Soc. Sec.*, 363 F.3d 1155, 1158 (11th Cir. 2004) (per curiam).

### 1.     Failure to have surgery.

Initially, the Court notes that it is unclear whether the ALJ's conclusion on this point discredited Plaintiff's subjective complaints because her failure to have surgery indicated that her pain was not severe, or because she was noncompliant with a recommendation to have surgery which would have relieved her pain. The Court will, therefore, examine both bases.

An ALJ may not substitute his own medical opinion for those of the medical experts. *Davis v. Barnhart*, 377 F. Supp. 2d 1160, 1164 (N.D. Ala. 2005) (citing *Marbury v. Sullivan*, 957 F.2d 837, 840-41 (11th Cir. 1992) (Johnson, J. concurring)). Moreover, an ALJ may not "succumb[] to the [forbidden] temptation to play doctor and make [his] own independent medical findings." *See Bennett,* 288 F. Supp. 2d at 1251. Here, the ALJ did not cite any medical evidence stating that surgery would have relieved Plaintiff's pain. In fact, Dr. Khajavi stated that "surgery at best might relieve some of [Plaintiff's] arm symptoms but probably wouldn't do anything for her other symptoms." [R218]. Thus, because none of Plaintiff's physicians suggested that surgery would have relieved Plaintiff's pain and even stated that surgery might not

39

relieve her pain, to the extent that the ALJ found that Plaintiff did not suffer severe pain because she did not undergo surgery earlier in her disability period, this finding could not be considered substantial evidence.  *See Bennett,* 288 F. Supp. 2d at 1251 (concluding that ALJ's failure to cite to any "medical evidence of record to support his opinion that because no surgery was recommended, the plaintiff could not suffer from disabling pain" was error)  (citing *Rohan v. Chater*, 98 F.3d 966, 970 (7th Cir. 1996)).

To the extent that the ALJ construed Plaintiff's lack of surgery as noncompliance with a recommendation to have surgery, the Eleventh Circuit has recognized that a refusal to undergo surgery may be used as grounds to deny benefits.  *Dawkins v. Bowen,* 848 F.2d 1211, 1213 (11th Cir. 1988) ("A medical condition that can reasonably be remedied either by surgery, treatment, or medication is not disabling.") (quoting *Lovelace v. Bowen,* 813 F.2d 55, 59 (5th Cir. 1987)); *Patterson v. Bowen*, 799 F.2d 1455, 1460 (11th Cir. 1986) (interpreting 20 C.F.R. § 404.1530 which permits denial of disability benefits for failure to follow prescribed treatment); *McCarty v. Richardson*, 459 F.2d 3, 4 (5th Cir. 1972)[21] (refusal to undergo corrective surgery grounds for denying benefits).  However, in order to base a "not disabled" finding on a refusal to

_____

[21]    The Eleventh Circuit Court of Appeals has adopted as binding precedent all decisions of the Fifth Circuit Court of Appeals rendered on or before September 30, 1981.  *Bonner v. City of Prichard*, 661 F.2d 1206, 1207 (11th Cir. 1981) (*en banc*).

40

undergo corrective surgery, the refusal must be "without good reason." *McCall v. Bowen*, 846 F.2d 1317, 1320 (11th Cir. 1988). Additionally, "[i]n order to deny benefits on the ground of failure to follow prescribed treatment, the ALJ must find that had the claimant followed the prescribed treatment, the claimant's ability to work would have been restored." *Dawkins,* 848 F.2d at 1213.

In this case, the ALJ did not cite to any instance where Plaintiff had unreasonably refused surgery. The record indicates that, at some point prior to orthopedic surgeon Dr. Khajavi's recommendation of surgery in April 2005, a neurosurgeon had made a contrary recommendation. [*See* R18].[22] However, "[e]very recommendation by a physician does not constitute a prescribed course of treatment." *Seals v. Barnhart*, 308 F. Supp. 2d 1241, 1250 (N.D. Ala. 2004) (citing *McCall*, 846 F.2d at 1319). Plaintiff testified that she did not refuse surgery, but rather that she did not want an orthopedist to perform surgery on her spine and that she consulted a neurosurgeon for a second opinion. [R239, 242]. Under these circumstances, the fact that Plaintiff did not undergo surgery at the time of the first recommendation does not equal a finding that she refused treatment. *McCarty*, 459 F.2d at 5 ("[W]e do not perceive it to be a

---

[22]     Although this fact does not appear in the determination and, therefore, the ALJ does not appear to have relied on it in reaching his conclusion regarding Plaintiff's credibility, the Court addresses this issue in an abundance of caution.

41

claimant's burden to undergo any and all surgical procedures suggested by her physician lest she be barred from disability benefits").

Moreover, to the extent that Plaintiff could be viewed as refusing surgery, the disagreement between the doctors as to whether or not Plaintiff should undergo surgery suggests that any "refusal" was not without good reason.  Indeed, Dr. Khajavi stated that he considered any "reluctance" Plaintiff may have had to undergo surgery to be "healthy."  [R218].

Nor did the ALJ find that surgery would have restored Plaintiff's ability to work.  As discussed above, Dr. Khajavi opined that surgery might relieve Plaintiff's arm pain but not her neck and back pain.  [R19].  Therefore, the questionable success of surgery undermines any reliance the ALJ may have placed on Plaintiff's failure to have surgery as a reason for discrediting her subjective complaints of pain.  Dr. Khajavi's opinion makes it clear that the surgery would not have relieved all of Plaintiff's pain and, therefore, is insufficient evidence that surgery would have necessarily restored her ability to work.  *See Weakley v. Heckler,* 795 F.2d 64 (10th Cir. 1986) (substantial evidence did not support denial of benefits because claimant refused to have prescribed back surgery where the ALJ did not present substantial evidence that rejected back surgery was expected to restore claimant's ability to work); *Schena v. Sec'y of Health*

42

*& Human Svcs.,* 635 F.2d 15, 19 (1st Cir. 1980) (finding of wilful refusal to have surgery not supported by record when "[t]he medical reports upon which the ALJ relied suggest that surgery would improve the claimant's condition, but did not deal with the question of whether the treatment 'could be expected to restore his ability to work.'"); *Russ v. Barnhart,* 363 F. Supp. 2d 1345, 1347 (M.D. Fla. 2005) ("Even assuming Claimant refused to comply with prescribed treatment, the judge lacked a sufficient basis to decide treatment compliance would have restored Plaintiff's ability to work.").

> 2.   *Noncompliance with recommended treatment/gaps in treatment.*

In making his credibility determination, the ALJ also appears to rely on Plaintiff's failure to attend 25% of her physical therapy sessions "and [that] the physical therapist advised that she was going to be discharged from the program due to compliance hurting the effort to resolve her medical issues." [R19]. Plaintiff's physical therapist's statement that she was "not confident that the patient is compliant with her home exercise program," [R108], also appears to be an additional reason that the ALJ rejected Plaintiff's subjective complaints.  [R15].

Plaintiff's physicians prescribed physical therapy as a course of treatment. [*See* R131].   However, similar to the ALJ's conclusion regarding the surgical recommendation, the ALJ did not explicitly find that compliance with physical therapy

43

would have restored Plaintiff's ability to work.  In order to deny benefits for failure to follow prescribed treatment, the "ALJ *must* find that if the claimant followed the prescribed treatment, his ability to work would be restored." *Patterson*, 799 F.2d at 1460 (emphasis added); *see also Dawkins*, 848 F.2d at 1213; *Seals*, 308 F. Supp. 2d at 1251 (failure to make finding that following prescribed treatment would restore ability to work, claimant may not be denied benefits on these grounds).[23]  Thus, to the

---

[23]  To the extent that a finding that physical therapy would have restored Plaintiff's ability to work is implicit in the decision, it is not supported by substantial evidence.

Plaintiff's final physical therapy treatment note does not cite noncompliance as the reason for Plaintiff's lack of progress.  Although the ALJ is correct that the physical therapist noted that Plaintiff had missed eight out of the twenty-nine scheduled appointments, cautioned Plaintiff that non-attendance hurt her progress, and stated that future cancellations or no-shows would result in discharge, [R131, R136], this warning came on January 31, 2002, nearly a full month before Plaintiff completed the remainder of the program without incident.  [*See* R133-36].  On February 12, 2002, after Plaintiff consistently had kept her appointments, the therapist noted that Plaintiff "may require more aggressive/invasive management of this problem."  [R134].  On February 22, 2002, treatment notes reflect that Plaintiff had made greater progress since attending her sessions regularly.  [R133].  However, on March 8, 2002, the therapist still concluded that Plaintiff had made "such minimal progress" that  physical therapy did not have "any more to offer her."  [R131].  Thus, the statement that physical therapy did not "ha[ve] any more to offer" Plaintiff, after she had begun attending her sessions regularly, does not support any conclusion that compliance with physical therapy would have restored Plaintiff's ability to work. *See Lucas v. Sullivan*, 918 F.2d 1567, 1572-73 (11th Cir. 1990) (ALJ's conclusion that claimant's "intermittent noncompliance" with taking prescribed medications was "a primary cause of her seizures" was not supported by substantial evidence when either noncompliance or inhibited absorption could have

extent that the ALJ relied on Plaintiffs' poor performance in physical therapy as grounds for finding Plaintiff's subjective pain complaints not credible, such reliance was not supported by substantial evidence.

_____

caused subtherapeutic drug levels); *Hillsman,* 804 F.2d at 1181 (failure to respond to treatment not caused by failure to follow treatment).

Moreover, where noncompliance is a factor in the ALJ's decision, he has a duty to investigate the reasons for the noncompliance.   *See Lucas*, *id.* (ALJ had duty to order objective testing to determine whether factors other than noncompliance with taking prescribed medication contributed to subtherapeutic drug levels); *Early v. Astrue*, 481 F. Supp. 2d 1233, 1238 (N.D. Ala. 2007) (ALJ has burden of proving unjustified noncompliance) (citing *Dawkins*, 848 F.2d at 1214); *Preston v. Heckler*, 769 F.2d 988, 990 (4th Cir. 1985) (denial of benefits due to noncompliance requires particularized inquiry as to reason for noncompliance).

In this case, the ALJ did not inquire as to the reasons for Plaintiff's noncompliance with her physical therapy.  The record shows, however, that Plaintiff may have missed at least three physical therapy sessions due to circumstances arguably out of her control.  Plaintiff apparently missed one appointment because of snow, [*see* R138], and two others because of "transportation issues." [R140, entry at November 30, 2001].  Furthermore, Plaintiff testified that she "couldn't do" the exercise that the physical therapist gave her, [R239], not that she refused, and the ALJ did not inquire as to why Plaintiff was unable, or unwilling, to perform the physical therapy exercises.   *See Bennett*, 288 F. Supp. 2d at 1251 (court suggested that noncompliance to physical therapy due to pain did not undermine credibility as significantly as unexplained noncompliance); *cf. Seals*, 308 F. Supp. 2d at 1250 ("[a] willful failure to follow treatment may not be assumed from a mere failure to accomplish the recommended change").

45

3.    *Inconsistent or infrequent treatment.*

The ALJ also found that Plaintiff's "inconsistent" or "infrequent treatment," [R19, 20], undermined her claims of disabling pain.  An ALJ may rely on gaps in the medical record to draw the inference that a claimant would have secured more treatment had the pain been as intense as alleged.  *Irlanda-Ortiz v. Sec'y of Health and Human Svcs.*, 955 F.2d 765, 769 (1st Cir. 1991); *Cashman v. Shalala*, 817 F. Supp. 217, 224 (D. Mass. 1993) (ALJ may take into account gaps  in treatment  during the relevant time period in determining whether a claimant is disabled.).  However, even where a claimant has not been treated at all for a substantial period of time, a gap in treatment will not automatically negate a finding of disability.  *See, e.g., Shaw v. Chater*, 221 F.3d 126, 133 (2d Cir. 2000) (gap in treatment will not negate compelling evidence of disability in the record).

Plaintiff's first complaint of neck pain was occurred on March 8, 2001, [R113], prior to her onset date of June 2001.  Plaintiff received medical care relating to

46

complaints of pain in her neck, arms and shoulders nearly every month, from October 5, 2001,[24] until May 6, 2002, when she lost her Medicaid eligibility.[25]

The record indicates that Plaintiff resumed her medical care on February 17, 2003, when she was seen at the Northside Pain Treatment Center for complaints of neck and arm pain.  [R198].  She returned on May 8, 2003, at which time the treating physician continued to treat Plaintiff's pain with Oramorph, Neurontin and also prescribed Flexeril.  Plaintiff was instructed to return in two months for an office visit. [*Id*.].

The next treatment note in the record is dated October 2, 2003, approximately six months after Plaintiff's May office visit and four months later than the physician instructed her to return.  This treatment note reflects that she had "some recent exacerbation" primarily in her upper extremities, and that on two or three occasions

---

[24]     The October 5, 2001, treatment note indicates that Plaintiff had been experiencing pain four to six weeks prior to that visit.  [R112].

[25]     Plaintiff's dates of service prior to losing her Medicaid eligibility include 3/8/2001, 10/5/2001, 11/5/2001, 11/13/2001 - 3/8/2002 (physical therapy), 12/17/2001, 1/22/2002, 2/13/2002 (epidural), 3/7/2002 (epidural), 4/18/2002 (epidural), 4/24/2002.

47

over the past six months had taken additional MS Contin.[26]  The record is not clear

whether Plaintiff received a different prescription for pain relief from another medical

provider, re-filled the prescription previously received from Northside, or had enough

of the prescription to carry her through the time between visits.  What is clear, however,

is that the October 2 treatment note does not reflect a gap in treatment which reasonably

could be construed to mean that her pain was not disabling.  Rather, it demonstrates that

Plaintiff, apparently to the chagrin of her pain managing physician, self-increased her

dosage of pain medication.  [*See* R196 (Under section of report titled "Plan": "We will

advise the patient to take all medication as prescribed.  Review of medication policy

and contract with the patient.") ].

The circumstances of this so-called gap in treatment between May and October

2003 is too fraught with ambiguity to constitute substantial evidence of non-

compliance.  The "ALJ has a basic obligation to develop a full and fair record."

*Cowart v. Schweiker*, 662 F.2d 731, 735-36 (11th Cir. 1981).  The fact that Plaintiff was

represented by counsel does not diminish this duty.  *See Brown v. Shalala*, 44 F.3d 931,

934 (11th Cir. 1995) (citing *Clark v. Schweiker*, 652 F.2d 399, 404 (5th Cir. Unit B July

---

[26]      Oramorph and MS Contin are brand names for morphine sulfate.
http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a682133.html (last visited
June 28, 2007).

48

1981)).  *Cf. Lucas*, 918 F.2d at 1572-73 (where noncompliance is a factor in the ALJ's

decision, he has a duty to investigate the reasons for the noncompliance).  Moreover,

> [b]efore a claimant can be denied benefits based on his noncompliance
> with prescribed medical treatment, he must be given a full opportunity to
> express the specific reasons for his decision not to follow the prescribed
> treatment.  *See* Social Security Ruling 82-59.  The ruling states that
> "[d]etailed questioning may be needed to identify and clarify the essential
> factors of refusal" and that the "record must reflect as clearly and
> accurately as possible the claimant's . . . reason(s) for failing to follow the
> prescribed treatment."  *Id.* The ruling describes questioning of claimants
> regarding "whether they understand the nature of the treatment and the
> probable course of the medical condition (prognosis) with and without the
> treatment prescribed" and provides that the "individuals should be
> encouraged to express in their own words why the recommended
> treatment has not been followed."  *Id.*

*Nunley v. Barnhart*, 296 F. Supp. 2d 702, 704 (W.D. Va. 2003); *see also Jackson v.*

*Barnhart*, 271 F. Supp. 2d 30, 38 (D.D.C. 2002), where the court held:

> Failure to follow a prescribed treatment plan is a basis for denying a
> claimant benefits when following the treatment plan would restore the
> claimant's ability to work.  *See* 20 C.F.R. § 404.1530.   To use
> non-compliance with prescribed treatment plans in this way requires an
> extensive inquiry by the ALJ into the circumstances surrounding a
> claimant's non-compliance.  *See id.*  The ALJ's decision did not address
> these circumstances.  Accordingly, the court remands this issue to allow
> the ALJ to specify how the plaintiff's failure to follow treatment plans
> factored into his decision.

49

Accordingly, since the ALJ did not so inquire, the record pertaining to the gap in treatment between July 2003 (when she was supposed to follow up from the May 2003 appointment) to October 2003 is inadequate to base a conclusion that Plaintiff's subjective complaints of pain lack credibility.

The October 2, 2003, treatment note indicated that Plaintiff should return for a recheck in four months, i.e, sometime in February 2004.  [R196].  Plaintiff's next instance of medical treatment appears to have been on June 25, 2004.  [*See* R186]. The record contains no explanation as to why she returned approximately four to five months later than her scheduled office visit.  However, after this point, from June 25, 2004 through April 1, 2005, Plaintiff was seen approximately every three months and received regular prescriptions for MS Contin, Neurontin and Flexeril from the Northside Hospital Pain Treatment Center.[27]  [*See* R185-86].

The Court also notes that the ALJ's finding that Plaintiff's treatment stopped on April 18, 2002, and began again in 2004, [R19], is obviously incorrect, since the record contains treatment notes from May 2003 (which refer to a February 2003 office visit) and October 2003.  In any event, other than one unexplained four/five month gap,

---

[27]     The record indicates that Plaintiff was seen on 6/25/2004, 9/17/2004, 12/10/2004, 3/5/2005 and 4/1/2005.  [R185-86].

50

Plaintiff appears to have been seen by a physician approximately every month before losing her Medicaid benefits and then approximately every three months for re-checks and prescription refills after her eligibility appeared to be reinstated.   [*See* R185]. The Court finds this one unexplained gap in treatment over the course of approximately four years of regular treatment, especially where it appears that Plaintiff still had a supply of medications over part of that period, is not substantial evidence of "inconsistent" or "infrequent treatment."[28]  [R20].  *Cf. Ogranaja v. Commissioner of Social Sec.*, 186 Fed. Appx. 848, 851 (11th Cir. 2006) (four year gap in treatment history substantial evidence that claimant not disabled).

### 3.      Plaintiff's claim of "getting better."

The ALJ also cites Plaintiff's statement that before her car accident "everything was getting better" as evidence that she did not suffer disabling pain.  Although improvement in a claimant's condition might, under some circumstances, support a finding that she is not disabled, improvement does not necessarily "equal an ability to

---

[28]     It also appears that the ALJ may have held the loss of her Medicaid benefits against Plaintiff as he states that her treatment stopped in April of 2002, approximately at the time she lost her eligibility. [*See* R19].  For example, the ALJ did not inquire when Plaintiff regained her Medicaid coverage or whether she had any other access to medical care at that time. The Eleventh Circuit has held that a Social Security claimant's lack of funds to pay for medical treatment excuses noncompliance. *Dawkins,* 848 F.2d at 1213.

AO 72A
(Rev.8/8
2)

work." *Seals*, 308 F. Supp. 2d at 1251; *see also Russ v. Barnhart*, 363 F. Supp. 2d 1345, 1348 (M.D. Fla. 2005) ("A potential for non-quantified improvement is too amorphous to justify concrete functional capacity.").  Despite the fact that the record indicates that Plaintiff was visiting Northside's Pain Treatment Center and continued to take the MS Contin and Flexeril during this same time period, the ALJ inquired neither how much improvement Plaintiff had experienced nor whether she could have worked during this period.[29]  Because the ALJ did not find that Plaintiff had improved sufficiently to be able to engage in substantial gainful activity, her statement that her condition had improved is not substantial evidence that she did not continue to experience disabling pain.

### 4.     Inconsistencies in Plaintiff's work history

Finally, the Court notes that the ALJ questioned Plaintiff's credibility because of one of her medical records indicated that she was still employed at the bridal shop in November 2001, after her onset date, and after she claimed to have been laid off. [*See* R18].  Dr. Carson observed that Plaintiff said she worked in a bridal shop and did a significant amount of heavy lifting but later noted that she was unemployed.

---

[29]     The Court also notes that Plaintiff told Dr. Khajavi that she had stopped taking Neurontin because her arm pain was improving. [R218].  Clearly, this statement did not refer to all of her symptoms.

[*See* R125].  Furthermore, Plaintiff's attorney stated during the hearing that the doctor had been referring to Plaintiff's former employment,  [R236-37], a point to which the ALJ indicated his understanding and did not further inquire about her employment status when seeing Dr. Carson.  Because the ALJ did not discuss either of these facts, he did not explain what weight he might have given to these statements that suggest that this record may have been in error.  *See Cowart*, 662 F.2d at 735 (ALJ must make clear the weight accorded to each item of evidence); *Gibson v. Heckler*, 779 F.2d .619, 623 (11th Cir. 1986) (the ALJ should state the weight accorded testimony presented at the hearing).

For the reasons set forth above, the Court finds that the reasons cited by the ALJ to reject Plaintiff's testimony regarding her pain are not supported by substantial evidence.  Accordingly, Plaintiff's case should be remanded for further consideration of Plaintiff's credibility as it relates to pain.

Although the Court has found the ALJ's credibility determination is not supported by substantial evidence, and, therefore, remand is appropriate, it will address Plaintiff's remaining arguments.

AO 72A
(Rev.8/8
2)

C.      *Disregarding Opinion of Treating Physician.*

Plaintiff contends that the ALJ improperly discounted Dr. Douglas's physical capacities evaluation and substituted his own opinion for that of Dr. Douglas. The Commissioner responds that substantial evidence supported the ALJ's decision to accord Dr. Douglas's evaluation no weight because no objective clinical findings were included in the evaluation and because Plaintiff had been seen at Grady primarily for female problems.

A treating physician's opinion "'must be given substantial or considerable weight unless 'good cause' is shown to the contrary.'" *Crawford*, 363 F.3d at 1159  (quoting *Lewis*, 125 F.3d at 1440); *see also* 20 C.F.R. § 404.1527(d)(2).    Although the Commissioner is correct that Dr. Douglas's evaluation does not contain any discussion of the objective clinical findings upon which she based her assessment, [*see* R179], the ALJ did not state that this was a reason for rejecting Dr. Douglas's evaluation. Post-hoc rationalizations, such as that advanced by the Commissioner, cannot be used to affirm the ALJ's decision.  *Owens v. Heckler* 748 F.2d 1511, 1516 (11th Cir. 1984) ("We decline . . . to affirm simply because some rationale might have supported the ALJ's conclusion.  Such an approach would not advance the ends of reasoned decision making."); *see also Shinn v. Comm'r of Social Sec.*, 391 F.3d 1276, 1287 (11th Cir.

2004) (refusing to affirm ALJ decision based on two state agency consultative examinations that ALJ did not mention in his determination).[30]

The ALJ rejected Dr. Douglas's assessment because "[t]reatment records from the Grady Clinic date back only to November 2004 and fail to confirm that the frequency and duration of the reported limitations is consistent with the medical findings. From the available notes, it appears that the claimant was being seen primarily for female problems." [R19-20]. The ALJ is correct that medical records documenting only "female problems" would not support a finding of limitations associated with Plaintiff's neck, shoulders and arms and could constitute good cause for rejecting her opinion regarding disability based on neck and arm pain. But it is not clear from the assessment exactly what records Dr. Douglas had at her disposal when completing the evaluation. Dr. Douglas diagnosed cervical disc herniation and radiculopathy. [R179]. This diagnosis suggests that she must have viewed some

---

[30]    The Court also notes that while the ALJ did not mention Dr. Schiff's RFC in his determination, choosing instead to rely on Dr. Lehman's, his RFC was in accord with Dr. Schiff's limitations. [*See* R20, 167-73].

55

medical records addressing Plaintiff's other medical treatment when making her assessment.[31]

However, it is well-established that the ALJ may reject the treating physician's opinion when "'it is not accompanied by objective medical evidence or is wholly conclusory.'" *Crawford*, 363 F.3d at 1159 (quoting *Edwards v. Sullivan*, 937 F.2d 580, 583-84 (11th Cir. 1991)).  Thus, because medical records documenting treatment for female problems is not objective medical evidence of neck and back problems or migraines, the ALJ had good cause to reject Dr. Douglas's physical capacities evaluation.  No error is shown on this point.

D.     *Plaintiff's Non-exertional Impairments.*

Plaintiff also argues that the ALJ erred when he failed, in formulating her RFC, to consider Plaintiff's non-exertional impairments of depression, the side effects from her medications and an inability to concentrate.  The Court considers each of these arguments in turn.

---

[31]       One possible location of these records is at R206-07.  However, these documents are of poor quality, so therefore the Court cannot decipher their contents to establish whether Dr. Douglas's opinion finds support in them.

56

       1.      *Depression.*

The ALJ first noted that Plaintiff testified that she took Zoloft for depression, [R15], but also found that "[t]he record does not reflect that the claimant has been diagnosed with this condition by acceptable medical protocol nor received any medical treatment for the same[,] thus is found to be not medically determined." [R18]. The Court agrees. The only reference to depression in the medical records is a conclusory statement in Dr. Khajavi's records that she has depression. [R218]. There are no other references in the medical documentation to Plaintiff being prescribed Zoloft or seeking a consultation for depression.

Accordingly, the ALJ's conclusion on this point is not erroneous.

       2.      *Medication side effects/ability to concentrate.*

The Court reaches a different conclusion regarding the ALJ's treatment of Plaintiff's alleged side effects and inability to concentrate. The Court finds the ALJ's assertions regarding Plaintiff's alleged side effects from her medications are conclusory and are not supported by substantial evidence from the record.

The ALJ questioned Plaintiff about her side-effects of her medication, in particular the MS Contin, but dismissed her testimony, stating only that "[t]he evidence fails to substantiate the claimant's allegations pertaining to the severity of side effects

57

AO 72A
(Rev.8/8
2)

of her medication."  [R19].  He also appeared to reject her claims of an inability to concentrate.  [*See* R20, 251].

However, the medical records indicate that Plaintiff complained to her doctors of side effects from her medications.  [R178, 196].   Moreover, it should be noted that Plaintiff's pain medications are known to produce side-effects of sedation (MS Contin)[32] and drowsiness (Neurontin[33] and Flexeril[34]).  The ALJ did not discuss the documented evidence of sedation/drowsiness side effects.  Upon remand, if still present, the ALJ is directed to address the documented side effects of Plaintiff's medications and their effect upon her RFC.  *See Lacy v. Barnhart,* 309 F. Supp. 2d 1345, 1352 (N.D. Ala. 2004) ("Documented side effects include drowsiness, light-headedness, dry mouth, nervousness, dizziness, weakness, queasy stomach, decreased memory, forgetfulness, day-time sleeping, and night-time insomnia. Rather than taking the time to educate himself on the debilitating side effects of these medications he

---

[32]     *See* RxList.com, MS-Contin Side Effects and Drug Interactions, http://www.rxlist.com/cgi/generic/ms_ad.htm, (last visited June 13, 2007).

[33]     *See* RxList.com, Neurontin Side Effects and Drug Interactions, http://www.rxlist.com/cgi/generic/gabapent_ad.htm, (last visited June 13, 2007) (stating that side effects include dizziness, drowsiness and peripheral edema).

[34]     *See* RxList.com, Flexeril Side Effects and Drug Interactions, http://www.rxlist.com/cgi/generic/cyclobnz_ad.htm (last visited June 13, 2007) (stating that side effects include drowsiness, fatigue and headaches).

AO 72A
(Rev.8/8
2)

summarily dismissed claimant's complaints."); *Doss v. Barnhart*, 247 F. Supp. 2d 1254, 1259 (N.D. Ala. 2003) (court took judicial notice of medications' typical side effects where ALJ dismissed side effects with the statement that there was no medical evidence documenting any side effects from plaintiff's medications).

Plaintiff's medications have side effects of fatigue, drowsiness and headaches, all of which affect a person's alleged inability to concentrate.  Upon remand, the ALJ should consider the side effects of Plaintiff's medication on any nonexertional impairments.

## VII.  CONCLUSION

Pursuant to this Court's power to enter a judgment affirming, modifying, or reversing the Commissioner's decision with remand in Social Security actions under sentence four of 42 U.S.C. § 405 (g),[35] the Court **VACATES** the ALJ's disability determination and **REMANDS** the case to the Commissioner to make further inquiry Plaintiff's credibility as to her subjective complaints of disabling pain, and any non-

---

[35]    "The final determination of the Commissioner of Social Security after a hearing under paragraph (1) shall be subject to judicial review as provided in section 405(g) of this title to the same extent as the Commissioner's final determinations under section 405 of this title."  42 U.S.C. § 1383(c)(3).

AO 72A
(Rev.8/8
2)

exertional limitations from the side effects of her medication and inability to concentrate.

The Clerk is **DIRECTED** to enter judgment for Plaintiff.

**IT IS SO DIRECTED AND ORDERED**, this the 29th day of June, 2007.

_____

**ALAN J. BAVERMAN**
**UNITED STATES MAGISTRATE JUDGE**

AO 72A
(Rev.8/8
2)